United States District Court
Southern District of Texas
**ENTERED**
January 23, 2020
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| In the Matter of Extradition | § | |
| | § | |
| of | § | Case No. H-18-146M |
| | § | |
| Joseph Valentino | § | |

## Order on Motion to Dismiss Extradition Complaint and Certification of Extraditability

By Complaint filed on February 2, 2018, the United States seeks the extradition of Joseph Valentino to the Netherlands. (D.E. 1.) Valentino has filed a Motion to Dismiss Extradition Complaint. (D.E. 55.) For the reasons stated below, the Motion to Dismiss is denied, and the court certifies that Valentino is extraditable to the Netherlands.

## A. Background

### 1. Criminal proceedings in the Netherlands

On November 19, 2002, the Amsterdam district public prosecutor issued a summons. (D.E. 60-1 at 860–71.[1]) The summons alleged Valentino committed the following crimes, among others: 1) participating in an organization that was for the purpose of committing crimes by carrying out preparatory acts relating to the purchase and/or sale of companies and/or making and/or maintaining contacts, in

---

[1] Where the documents are marked with a bates number in the form of "EX-VALENTINO-#####," all citations are made to the numerical values (#####), excluding the null zeroes.

violation of Article 140 of the Netherlands Penal Code; and 2) filing incorrect corporate income tax (CIT) returns, in violation of Article 68 of the Netherlands State Taxes Act. (*Id.* at 860–67.) It is not clear that Valentino received the summons.

Valentino did not appear for trial. The trial was held *in absentia*, and the judgment was rendered on February 24, 2004. (*See* D.E. 60-1 at 858.) Valentino was convicted and sentenced to imprisonment. (*Id.* at 1187.) Valentino appealed his conviction and sentence to the Court of Appeals of Amsterdam. (*See* D.E. 1-1 at 71–119.) He was represented by counsel on appeal. (*See id.*)

On July 13, 2007, the Court of Appeals of Amsterdam rendered a new judgment, setting aside the trial court's judgment. (D.E. 60-1 at 1188.) The Court of Appeals of Amsterdam found Valentino guilty on two counts: Count One—"participation in an organization for the purpose of committing crimes"—and Count Two—"co-perpetration of intentionally incorrectly filing a tax return provided by tax law." (*See* D.E. 9-1 at 224; D.E. 60-1 at 1188.)[2] The Court of Appeals sentenced Valentino to thirty-four months in prison. (D.E. 60-1 at 1188.)

Valentino appealed to the Netherlands Supreme Court, which declared Valentino's appeal "inadmissible." (*See* D.E. 9-1 at 224.) The judgment of the Court of Appeals of Amsterdam thus became final.

---

[2] The Court of Appeals of Amsterdam acquitted Valentino of Count Three—"intentional use of forgery of documents." (*See* D.E. 60-1 at 1184.)

**2. Extradition proceedings in the United States**

On February 2, 2018, the United States filed a complaint to begin these proceedings against Valentino for extradition to the Netherlands. (D.E. 1.) After a detention hearing, Valentino was released on bond. (D.E. 29.) On August 30, 2019, Valentino moved to dismiss the extradition complaint (D.E. 55) and filed a memorandum in support of his motion. (D.E. 56.)

On December 4, 2019, this court held a formal extradition proceeding during which Valentino appeared before the court in open session, accompanied by his attorney, and in the presence of the Assistant United States Attorney. Valentino's counsel presented arguments in support of his motion to dismiss the extradition complaint. Both parties submitted supplemental briefs after the hearing. (D.E. 70, 71.)

**B. Analysis**

The court conducts a limited inquiry in response to an extradition complaint. *See* 18 U.S.C. §§ 3181–95. The court must make the following findings to certify the extradition: (a) the judicial officer is authorized to conduct the proceeding, (b) the court has jurisdiction over the fugitive, (c) a valid extradition treaty exists between the United States and the Netherlands, (d) the offense charged is extraditable under the Treaty and United States law, and (e) there is a reasonable basis of finding probable cause that Valentino committed the offense for which the

3

extradition is sought. *See* 18 U.S.C. § 3184; *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1402 (9th Cir. 1988).

The rule of non-inquiry in international extradition cases requires courts to "refrain from investigating the fairness of a requesting nation's justice system, and from inquiring into the procedures or treatment which await a surrendered fugitive in the requesting country." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997) (internal quotation marks omitted). "Undergirding [the rule of non-inquiry] is the notion that courts are ill-equipped as institutions and ill-advised as a matter of separation of powers and foreign relations policy to make inquiries into and pronouncements about the workings of foreign countries' justice systems." *Matter of Requested Extradition of Smyth*, 61 F.3d 711, 714 (9th Cir.), *amended sub nom. Matter of Smyth*, 73 F.3d 887 (9th Cir. 1995). "It is not that questions about what awaits the [extraditee] in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed." *Kin-Hong*, 110 F.3d at 110.

## 1. The judicial officer is authorized to conduct the proceeding.

Under the extradition statute, a magistrate judge authorized by a court of the United States may conduct the extradition hearing and certify the extradition. 18 U.S.C. § 3184. The Southern District of Texas authorizes magistrate judges to

4

perform "all of the duties allowed by law." L.R 72. Thus, the undersigned is authorized to conduct the extradition proceeding and certify the extradition.

**2. The court has jurisdiction over Valentino.**

The court has jurisdiction to extradite "any person found within [the court's] jurisdiction." *See* 18 U.S.C. § 3184. Valentino appeared in court in the Southern District of Texas. The court has jurisdiction over Valentino.

**3. A valid extradition treaty exists between the United States and the Netherlands.**

A valid extradition treaty exists between the United States and the Netherlands. *See* Extradition Treaty between the United States of America and the Netherlands, U.S.-Neth., June 24, 1980, 35 U.S.T. 1334 ("U.S.-Neth. Treaty").

**4. The offense charged is extraditable under the Treaty.**

Article 2 of the Treaty defines extraditable offenses as "[o]ffenses referred to in the Appendix to this Treaty which are punishable under the laws of both Contracting Parties" or "[o]ffenses, whether listed in the Appendix to this Treaty or not, provided they are punishable under the Federal laws of the United States of America and the laws of the Kingdom of the Netherlands." U.S.-Neth. Treaty, art. 2 ¶¶ 1.a.–b. The Treaty also provides that the laws of the two countries need not "place the offense within the same category of offenses or denominate an offense by the same terminology." U.S.-Neth. Treaty, at art. 2, ¶ 1.

The offenses charged under Counts One and Two are listed in the Appendix. *See* U.S.-Neth. Treaty, App., ¶ 22 ("Offenses relating to willful evasion of taxes and duties"). The offenses are punishable in the United States as violations of the following statutes: conspiracy to evade taxes or to assist in the preparation of false tax returns, *see* 18 U.S.C. § 371; 26 U.S.C. §§ 7201, 7206(2); aiding or assisting in the preparation of false tax returns, *see* 26 U.S.C. § 7206(2); and/or tax evasion, *see* 26 U.S.C. § 7201. Thus, the dual criminality requirement set forth in Article 2 of the Treaty is satisfied. *See* U.S.-Neth. Treaty, art. 2. The parties do not dispute that the offenses for which Valentino was convicted are extraditable.

**5. There is a reasonable basis to find probable cause that Valentino committed the offenses for which the extradition is sought.**

The extradition statute requires the certifying court to find "evidence sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184. Courts have interpreted the statute to require a showing of probable cause, similar to that required in preliminary criminal proceedings in the United States. *See Gusikoff v. United States*, 620 F.2d 459, 462 (5th Cir. 1980) ("Hearings held pursuant to Section 3184 are in the nature of a preliminary hearing. . . The foreign country does not have to show actual guilt, only probable cause that the fugitive is guilty.") To find probable cause, the court asks "if there is evidence sufficient to show reasonable ground to believe the accused guilty." *Sayne v. Shipley*, 418 F.2d 679, 685 (5th Cir. 1969).

The applicable extradition treaty may establish "what constitutes an adequate evidentiary showing." *Haxhiaj v. Hackman*, 528 F.3d 282, 288 (4th Cir. 2008). As reflected by Article 9 of the Treaty, the United States and the Netherlands agreed upon specific documentary support that must accompany an extradition request between the two countries. Paragraph 2 of Article 9 requires that all extradition requests be accompanied by the following: information about the identity of the person sought; "[a] statement of the facts of the case including, if possible, the time and location of the crime"; and provisions of the law describing the elements, designation, and punishment of the offense, among others. *See* U.S.-Neth. Treaty, art. 9, ¶ 2.

Article 9 requires additional documents depending on the purpose of the specific extradition sought. If the extradition is for the prosecution of the extraditee, the extradition request must include a copy of the arrest warrant and "[s]uch evidence as, according to the law of the Requested State, would justify that person's arrest and committal for trial if the offense had been committed there . . . ." U.S.-Neth. Treaty, art. 9, ¶ 3. In other words, if extradition is requested to prosecute a person criminally charged in the Netherlands, the extradition request must be accompanied by evidence of probable cause that the person sought committed the crime.

If, on the other hand, the extradition is for the enforcement of the sentences relating to an already convicted person, a certified judgment of conviction and

sentence imposed, together with proof of the extraditee's identification, may be enough to satisfy the requirements of the Treaty if the person was tried, convicted, and sentenced in the Netherlands. U.S.-Neth. Treaty, art. 9, ¶ 4.

The Treaty does not contain a separate provision for requests to extradite those who were convicted of an extraditable offense *in absentia*. Valentino argues that when a person has been convicted *in absentia*, the conviction is treated as a mere charge and the extradition request must be accompanied by a showing of probable cause. (Valentino Mem., D.E. 56 at 27.) The government argues that evidence of even an *in absentia* conviction may by itself be sufficient to establish probable cause. (Gov't's Resp., D.E. 59 at 33–34.) The law is not clear on this point. Because Valentino was tried *in absentia*, the court will analyze the issue of probable cause as if he were not yet convicted, even though he is being extradited not for trial but for service of a sentence.

Valentino argues that the government has not offered sufficient evidence to demonstrate probable cause to believe that Valentino committed the offenses charged under Counts 1 and 2 under the law of the Netherlands. An extradition proceeding is not a relitigation of guilt or innocence; the court's review is limited to a probable cause determination. *See* 18 U.S.C. § 3184; *Benson v. McMahon*, 127 U.S. 457, 462–463 (1888); *In re Extradition of Drayer*, 190 F.3d 410, 415 (6th Cir. 1999) ("An extradition proceeding is not a forum in which to establish the guilt or

innocence of the accused; rather, the sole inquiry is into probable cause."). Probable cause exists if there is "any evidence warranting the finding that there was reasonable ground to believe the accused guilty" under the laws of the requesting state. *See Koskotas v. Roche*, 931 F.2d 169, 176 (1st Cir. 1991).

As an initial matter, Valentino argues that the court may not rely on the facts set forth in the judgment issued by the Court of Appeals of Amsterdam because he was tried *in absentia*. (Valentino mem., D.E. 56 at 27–29.) He argues that the only "actual evidence" provided by the government does not provide enough information to incriminate him. Valentino argues that this court should not rely on the judgment by the Court of Appeals of Amsterdam because, although the judgment quotes other documents and witness interviews, the underlying evidence was not made available to Valentino. (*Id.* at 28.)

Valentino's argument lacks merit. In extradition proceedings, the court may consider hearsay and other evidence even though it may not be admissible at trial. *Fernandez v. Phillips*, 268 U.S. 311, 311 (1925); *see Hoxha v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006) ("A judge may rely on hearsay evidence in considering whether probable cause is satisfied.").

In *Haxhiaj v. Hackman*, 528 F.3d 282 (4th Cir. 2008), the court denied an argument similar to Valentino's, raised by an extraditee who was convicted *in absentia*. The relevant extradition treaty in *Haxhiaj* contained a separate provision

for extraditing a person convicted *in absentia*. That provision required the extradition request to be accompanied by evidence establishing probable cause. *Compare Haxhiaj*, 528 F.3d at 289 (finding that the provision required a showing of "a reasonable basis to believe that the person sought committed the offense" to extradite a person convicted *in absentia*) *with Sayne*, 418 F.2d at 685 (holding that the probable cause inquiry asks "if there is evidence sufficient to show reasonable ground to believe the accused guilty"). The *Haxhiaj* court held that the probable cause requirement "clearly does not require the kind of actual evidence suggested by [the extraditee], such as trial testimony or transcripts of the wiretap evidence." *Haxhiaj*, 528 F.3d at 289. The court concluded that the appellate opinion by the foreign court established a reasonable basis to believe that the extraditee committed the offense. *Id.* at 289.

The probable cause requirement does not require the government to submit actual evidence as Valentino argues. A typical appellate opinion would satisfy the probable cause requirement. *See Haxhiaj*, 528 F.3d at 289. Here, the judgment of the Court of Appeals of Amsterdam is much more than a typical judgment from a court in the United States. It is a 293-page-long analysis of Valentino's trial and appeal, discussing much of the documentary and testimonial evidence presented in court, accompanied by detailed fact findings and legal conclusions. (*See* D.E. 60-1 at 888–1189.) Valentino has offered no evidence to show that the facts set forth by the Court

10

of Appeals of Amsterdam are incorrect. Valentino does not provide a good reason for this court not to rely on those facts. Therefore, the court takes the factual findings by the Court of Appeals of Amsterdam as the facts of this case, which are discussed below.

### a) Valentino's Conduct

Valentino worked for Oxbridge Investments Limited, a Bahamian corporation, first as a lawyer but then as a business partner. (*See* D.E. 60-1 at 1040–41.) Valentino's law firm received a legal fee, and Valentino received separate compensation from Oxbridge. (*See id.* at 1041, 1169.)

Valentino helped Oxbridge acquire "for-profit companies" (FPCs) in the Netherlands that had "an amount of liquid funds at the time of the transfer that is at least equal to the amount of the substantive tax debt." (*See* D.E. 60-1 at 891–95.) Below are the FPCs that are relevant to the present case:

| Acquisition Date | Former Name | New Name |
|---|---|---|
| December 9, 1992 | Anterra Beheer Amsterdam B.V. | American Energy B.V. |
| December 9, 1992 | Penn (Iberica) B.V. | Censor Investments B.V. |
| October 27, 1993 | Interbaros International Holdings B.V. | American Energy Trading B.V. |
| November 16, 1994 | Rentafixe N.V. | American Energy Resources N.V. |
| August 31, 1995 | Egg B.V. | American Energy Mining B.V. |
| September 11, 1996 | Egg II B.V. | American Energy Exploration B.V. |

(*See* D.E. 60-1 at 894.)

11

These FPCs shared common characteristics prior to being acquired by Oxbridge. Each held a substantial loan to its shareholder, and each received interest on the loan as its sole income. (D.E. 60-1 at 894.) That interest was the FPCs' only taxable income, on which the Dutch taxing authority assessed corporate income tax (CIT). (*Id.* at 895.) The FPCs' assets consisted of the outstanding loan principal and cash held in a bank account in an amount equal to the CIT owed to the Netherlands taxing authority. (*Id.* at 894–95.)

The Dutch FPCs that Oxbridge acquired became Oxbridge subsidiaries. (D.E. 60-1 at 894.) Oxbridge financed the acquisition of the FPCs with short-term, high-interest loans. (*Id.* at 1028–29.) Oxbridge repaid the loans with the liquid funds of the company it just acquired, that is, the funds intended to pay the tax owed to the Netherlands. (*Id.*) This left the FPCs with insufficient funds to pay taxes.

Valentino devised a scheme to reduce the FPCs' tax liability to zero. On behalf of Oxbridge, Valentino and other Oxbridge principals purchased "intangible assets,"[3] such as rights in minerals or intellectual property, at a price that, according to the Court of Appeals, "was not easy to find out." (D.E. 60-1 at 895.) Oxbridge resold the intangible assets to the FPCs at an artificially high price in order to show large depreciation on their books. For example, although a patent promised no

---

[3] Van Dieren, an accountant who provided services to Oxbridge, testified that these assets are "intangible" in that they are "not a right in the underlying property itself, but exploitation rights to that property." (D.E. 60-1 at 972.)

economic value, an Oxbridge subsidiary purchased its license for $93 million. (*Id.* at 920.) In another example, Oxbridge's Dutch subsidiaries showed almost $4.6 billion on its books for rights to coal, although that value was not supported by the purchase price or the market value. (*See id.* at 931–36.) A witness testified that the main purpose behind Oxbridge's purchase of coal rights was for a "European tax shelter." (*Id.* at 935.)

The Dutch FPCs then showed high levels of depreciation on the intangible assets over a short-term period to offset the taxable interest payments on the loans it held. (D.E. 60-1 at 895–96.) As a result, the taxable profits of the FPCs "were converted into losses." (*Id.* at 896.)

The funds previously earmarked for CIT obligations were distributed to Valentino and Oxbridge's principals. As mentioned, they first used the liquid assets of the Dutch FPCs to pay back the loans it took to finance the FPCs. (D.E. 60-1 at 1028–29.) Then they divided the remaining balance of the cash assets of the FPCs among themselves. (*Id.* at 1028–29, 1169.)

The Court of Appeals of Amsterdam found that the intangible assets "had only a fraction of the value that was claimed in the accounts of the for-profit companies; in other words, there was virtually nothing (of any value) to exploit." (D.E. 60-1 at 1031.) The Court of Appeals found that Valentino carried out the transactions for Oxbridge while he was "well aware that the actual value of the intangible assets—

and thus the extent of the partially-related depreciations—were considerably smaller than the value claimed, and that the latter value upon closer consideration could not be (sufficiently) substantiated." (*Id.* at 1030.) According to the Court of Appeals, the "underlying motive for all this was obviously to empty the for-profit company of the 'surplus' cash." (*Id.* at 962.) Oxbridge's Dutch subsidiaries "intentionally filed incorrect CIT returns," and as a result, caused tax loss to the Netherlands. (*Id.* at 968, 976.) The court agrees.

With this factual background, the court analyzes the probable cause supporting each Count in turn.

### b) Count One: Valentino participated in Oxbridge's scheme to evade taxes in the Netherlands by filing inaccurate CIT returns.

Valentino was charged under Count One with violating Article 140 of the Netherlands Penal Code. According to the certified translation included in the record, Article 140 punishes either "[p]articipation in an organization that has as its object the commission of crimes" or "[p]articipation in the continuation of the work of a legal entity which has been declared as prohibited by a final court decision and has therefore been dissolved." (D.E. 9-1 at 225.) According to the Court of Appeals of Amsterdam, the elements of Count One are "(a) participation (b) in a structured and lasting organization, (c) the purpose of which is to commit crimes." (D.E. 60-1 at 979.) The court's review of the record shows that sufficient evidence exists to believe that Valentino participated in multiple stages of the scheme to acquire and

sell the rights in various assets on behalf of Oxbridge, which resulted in false corporate tax returns being filed in the Netherlands. The evidence also shows that Valentino knew the tax returns contained false information about the value of the intangible assets and the amount of depreciation being shown for those assets.

The key enablers of Oxbridge's transactions with the FPCs—Fay Russell, Gareth Thomas, Björn Monteine, David Williams, and Douglas Shook—all testified that Valentino orchestrated the purchase, sale, and tax accounting involving the intangible assets used to manipulate the FPCs' tax returns. Russell stated that Valentino presented him with the idea to eliminate the FPCs' tax liability by acquiring and depreciating the intangible assets on an accelerated basis. (*See* D.E. 60-1 at 1040.) Russell testified that Valentino constructed the scheme to acquire, assign, and depreciate the assets. (*Id.*) Namely, Valentino developed the budget, prepared promissory notes, and wrote complex purchase and sale contracts. (*See id.* at 1040, 1042–43.)

Russell's testimony is corroborated by other witnesses, including Thomas, Williams, Monteine, and Shook:

- Thomas testified that Valentino was the "brain[] of the organization" (*see* D.E. 60-1 at 1045, 1047, 1132);
- Williams testified that Valentino explained to him how the deals and the tax shelters worked; that Valentino was "at the top of the organization [Oxbridge]"; and that it was Valentino who found the loopholes in Dutch tax law (*id.* at 1048–49, 1173–75);

- Shook testified that Valentino drafted all documents pertaining to the mineral assets, which contained the time periods used to depreciate those assets (*id.* at 1050);
- Monteine stated that Valentino was "intensely involved" with Oxbridge and that Valentino was the one who designed the entire scheme. (*Id.* at 1050.)

Witnesses also testified that Valentino was instrumental in Oxbridge's transactions to acquire intangible assets. Thomas testified that Valentino prepared documents for Oxbridge to purchase the right to certain coal in Kentucky. (D.E. 60-1 at 1047.) Shook testified that Valentino told him to adjust down the thickness of the coal layers used in estimating the quantity of coal, in order to inflate the valuation of coal. (*See id.* at 933–34.) As to Oxbridge's investment in zeolite, Shook stated that Valentino drafted a document called "Assignment of Production Payment" and proposed a purchase plan that would result in a substantial reduction in tax liability worth approximately 80 million Dutch guilders. (*Id.* at 943.) Shook also testified that Valentino facilitated Oxbridge's purchase of concession rights in certain coal in Mexico. (*Id.* at 950–51.) Another witness, Johnny Lester, stated that Valentino participated in the negotiation of the acquisition of a silver mine in Colorado and drafted the acquisition agreement on behalf of Oxbridge. (*Id.* at 953–57.)

In addition, witnesses testified that Valentino had direct involvement in the preparation of the tax returns for the Dutch FPCs. Shook testified that Valentino "[drew] up the majority of the documents that the Netherlands Tax and Customs Administration had requested." (D.E. 60-1 at 1050.) Russell stated that Valentino

16

collected financial information for tax returns and prepared tax declarations with Rien Van Dieren, who provided accounting services to Oxbridge as an employee of the accounting firm, Arthur Anderson. (*Id.* at 1043.) Van Dieren corroborated Shook's statement. He testified that Valentino discussed with him "the pace at which the [intangible] rights were depreciated." (*Id.* at 960, n.289.) The Court of Appeals of Amsterdam concluded that Valentino was the source of the information used in the CIT returns: "[t]he tax data, valuations, amounts of the depreciations and 'fees,' mutual obligations of companies within the Oxbridge group, [and] transfer of the intangible assets." (*Id.* at 1030.)

Witnesses also testified that Valentino participated in distributing the liquid assets of the Dutch FPCs among the Oxbridge principals, including drafting the payment schedules. (D.E. 60-1 at 1041.) Russell stated that Valentino got a portion of the cash distributions. (*Id.* at 1169.) Van Dieren testified that the practice of draining cash from the FPCs was not standard practice:

> If all cash had gone to Oxbridge or Kentucky Land, I could have understood that. Because in that case I would [have] assumed that they used the money for investments or exploitation. My observation that the money was being drained was a big shock to me. You would expect the cash to be used for investments, and certainly not that the money would be diverted to Luxembourg or Liechtenstein.

(*Id.* at 974.)

The Court of Appeals of Amsterdam found that Valentino and Oxbridge principals, "together with their investment vehicle, Oxbridge, participated in a

17

systematic and continuing collaboration, directed towards the perpetration of criminal offenses." (D.E. 60-1 at 1051.) The court agrees. The court finds a reasonable basis to believe that Valentino participated in Oxbridge and its Dutch FPCs' scheme to file inaccurate tax information and/or CIT returns with the Dutch taxing authority. Thus, there is probable cause to believe that Valentino committed the offenses charged under Count One.

### c) Count Two: Probable Cause exists to believe that Valentino intentionally acted to assist the Oxbridge-subsidiary FPCs to make false statements to the Netherlands taxing authority.

Valentino was charged under Count Two with violating Article 68 of the Netherlands State Taxes Act by intentionally filing an incorrect tax return in conjunction with the Dutch FPCs. (D.E. 60-1 at 861.) According to the certified translation of the Netherlands State Taxes Act, Article 68 punishes anyone who, being required by law to provide tax information, "provides incorrect or incomplete information, data or instructions" if doing so "could result in too little tax being levied." (D.E. 9-1 at 225–26.) The Act enhances sentencing for anyone who intentionally commits that offense. (*Id.* at 226.)

The Court of Appeals of Amsterdam found that "the accusation under count 2 of the indictment is co-perpetration of intentionally filing incorrect and/or incomplete corporate income tax returns, and, alternatively, having actual control of this crime, committed by the for-profit company in question." (D.E. 60-1 at 1182.)

Reading Article 68 together with the Court of Appeals' interpretation of the law, the court concludes that to show probable cause as to Count Two, the record must contain evidence that (a) Oxbridge's Dutch subsidiaries intentionally filed incorrect and/or incomplete CIT returns, (b) Valentino intentionally cooperated with the Dutch FPCs to help perpetrate that crime, and (c) the result could be that the FPCs' tax liability was understated.

Evidence shows Valentino insisted on using accelerated depreciation to eliminate the Dutch FPCs' taxable income, despite contrary advice from Van Dieren. In a fax, Van Dieren explained to Valentino that the three-year straight-line depreciation method "is in all likelihood not acceptable unless the 400,000,000 tons [of coal] would be mined in those 3 years in almost equal portions." (D.E. 60-1 at 1022.) Valentino nevertheless insisted on using the straight-line depreciation method. (*Id.* at 1022–23.) According to the minutes of a meeting in which Valentino participated, he and other Oxbridge representatives continued to insist on using straight-line depreciation to offset a "substantial" interest income of one of the Dutch FPCs, Interbaros. The minutes stated:

> Interbaros has a substantial amount of interest income in 1993.
> *So desirable: a fast depreciation
> . . . [S]olutions (possible) to generate costs for Interbaros: . . .
>     2. Depreciation method:
>         speculative: 'Unit of production'
>         certainty: straight line

(*See id.* at 1023.) A month later, Valentino wrote to Russell about another transaction: "[w]ith some coaching from my part they may get to the point of accepting the position that the coal investment is entitled to a straight line write off . . . ." (*Id.*) The Court of Appeals of Amsterdam found that this evidence, among other things, shows that Valentino "strongly insisted on accelerated depreciation of the intangible assets," despite contrary advice from Van Dieren. (D.E. 60-1 at 1023.) The Court of Appeals of Amsterdam also found that Valentino was "well aware" of the speculative value of the intangible assets. (D.E. 60-1 at 1030.) The court agrees.

As to the understatement of the FPCs' tax liability, the Court of Appeals of Amsterdam found that "the above-mentioned depreciation," and the "fictitious" charges "arising from the contribution of intangible assets" resulted in the tax declaration "of too low a taxable amount." (D.E. 60-1 at 976.) The Court of Appeals of Amsterdam concluded, "it [is] proven in all cases discussed here that the result of incorrect declaration could be that too little tax could be levied." *Id.*

Taking the findings as to Count Two together with the findings as to Count One[4]—that Valentino enabled Oxbridge to buy previously profitable Dutch FPCs with taxable income, acquire intangible assets for which the FPCs took depreciation, report negative taxable income on those FPCs, then drain cash from the FPCs to pay himself and others—it is clear to the court that Valentino undertook the transactions

---

[4] *See supra* Part B.1.a.

for Oxbridge with a view toward providing false information to avoid the Dutch FPCs' tax liability owed to the Netherlands and profit from it.

Sufficient evidence shows that Valentino intentionally acted to assist the Oxbridge-subsidiary FPCs to make false statements in their corporate income tax returns to the Netherlands taxing authority. Thus, the court finds probable cause that Valentino committed the offenses charged under Count Two.

In sum, the government has demonstrated probable cause to believe that Valentino committed the offenses charged under Counts One and Two under the law of the Netherlands.

### 6. Valentino is extraditable under Article 6 of the Treaty.

Valentino argues that his extradition would violate the Treaty because the statute of limitations under the law of the United States would have barred his prosecution. Valentino also argues that the lapse of time between the sentencing in the Netherlands and the filing of the extradition complaint in the United States violates the Treaty. [5]

Article 6 of the Treaty, entitled "Lapse of Time," bars extradition "when the prosecution or the enforcement of the penalty for the offense for which extradition

---

[5] Valentino initially raised another argument that the Netherlands failed to provide a complete translation of the documents as required by Article 9 of the Treaty (*see* D.E. 56 at 2), but he withdrew that argument (*see* D.E. 61 at 14–15) upon the government's filing of the full translated opinion by the Court of Appeals of Amsterdam (*see* D.E. 60-1) and the translated statute that confers jurisdiction on the courts of the Netherlands. (*See* D.E. 60-2 at 1196.)

has been sought has become barred by lapse of time according to the law of the Requested State." U.S.-Neth. Treaty, art. 6. Under the Treaty, the time-bar may apply to prosecuting the extraditee or enforcing the penalty against the extraditee. *Id.*

Valentino argues that, because he was tried *in absentia*, the original prosecution must have been timely or else extradition would violate Article 6. The government disagrees and argues that, because Valentino is already convicted and sentenced, the limitations period for the original prosecution is irrelevant. The law is not clear on this point. The court will therefore consider whether the original prosecution would have been time-barred and whether extradition for service of the sentence imposed is time-barred.

### a) Extradition is not barred based on lapse of time since conviction.

In the United States, there is no time bar for enforcement of sentences. *See Martinez v. United States*, 828 F.3d 451, 458 (6th Cir. 2016) (stating that time bar for imposing penalties are "generally unknown in the United States"); Restatement (Third) of the Foreign Relations Law of the United States § 476 cmt. e (1987). The statute of limitations does not provide for one,  see 18 U.S.C. §§ 3281–90, and Valentino has offered no authority supporting the proposition that there is such a limitation. Because there is no time-bar to enforce a sentence in the United

States, extraditing Valentino for the enforcement of the sentence would not violate Article 6.

Valentino also argues the delay in extradition violates the Due Process Clause of the Constitution. "[T]here is no due process right to a speedy extradition." *In re Extradition of Drayer*, 190 F.3d at 415; *see Martin v. Warden, Atlanta Pen*, 993 F.2d 824, 830 (11th Cir. 1993) (holding that the extraditee has no right to a speedy trial under the Due Process Clause, the Fifth Amendment, or the Sixth Amendment). Further, interpreting Article 6 to impose a limitations period on punishment in the foreign country would conflict with the rule of non-inquiry. In *Yapp v. Reno*, 26 F.3d 1562 (11th Cir. 1994), the court applied the rule of non-inquiry, in the context of holding that the "lapse of time" provision of an extradition treaty did not implicate the constitutional speedy trial right. The court explained:

> Determining whether a statute of limitations has run requires a mathematical calculation that can usually be performed simply by referring to the applicable statutory provision. A speedy trial inquiry would require a district judge or magistrate judge, generally unfamiliar with foreign judicial systems and the problems and circumstances facing them, to assess the reasonableness of a foreign government's actions in an informational vacuum. We do not think the parties who negotiated the 1931 Extradition Treaty would have intended to abrogate the rule of non-inquiry without stating their intention to do so more explicitly.

*Yapp*, 26 F.3d at 1567–68.

The reasoning in *Yapp* applies here. A due process inquiry into the lapse of time between the judgment in the Netherlands and the extradition request would

require this court to assess the reasonableness of the Dutch government's actions. That is not a proper task for this court. It follows that the rule of non-inquiry counsels against reading Article 6 of the Treaty to implicate constitutional due process principles as it relates to the lapse of time between the conviction and the filing of the extradition request.

Thus, the court finds that any delay between the conviction and the filing of the extradition complaint does not bar Valentino's extradition.

### b) Extradition is not barred based on lapse of time between the offenses and initiation of prosecution.

To the extent that the statute of limitations on the prosecution of Valentino is applicable, the parties agree that the issuance of the summons stopped the statute of limitations from running. (*See* Valentino Mem., D.E. 56 at 15; Gov't's Resp., D.E. 59 at 13.) The Netherlands issued its summons outlining the charges against Valentino on November 19, 2002. (D.E. 60-1 at 860–71.) The issue is whether on that date, the offenses underlying Counts One and Two could have been prosecuted in the United States under the applicable statute of limitations.

"In determining what United States statute of limitations is applicable, this Court looks to the substantive offense under United States law which is most closely analogous to the charged offenses, and applies the statute of limitations applicable to that offense." *Sainez v. Venables*, 588 F.3d 713, 715 (9th Cir. 2009). The nature of the charged conduct, rather than similarities in the statutory language, is the focus

of the inquiry in determining which offense under United States law is most closely analogous to the charged offenses. *See Clarey v. Gregg*, 138 F.3d 764, 767 (9th Cir. 1998), *cert. denied*, 525 U.S. 853 (1998). The overriding concern is whether Valentino's offenses could have been prosecuted without offending the statute of limitations in the United States. *Clarey*, 138 F.3d at 767.

The court analyzes each count in turn.

### (1) Prosecution under Count One did not violate the statute of limitations.

In Count One, Valentino is alleged to have violated Article 140 of the Netherlands Penal Code, which outlaws "[p]articipation in an organization that has as its object the commission of crimes." (*See* D.E. 9-1 at 225; D.E. 60-1 at 860–61.) The Court of Appeals of Amsterdam found that "from January 1, 1992 through April 11, 2000, in Amsterdam, [Valentino] participated in an organization, being a collaboration consisting of [Oxbridge, its principals, and its Dutch subsidiaries], which organization was for the purpose of committing crimes," including forgery of documents, filing incorrect CIT returns, and bribing persons other than civil servants. (*See* D.E. 60-1 at 884.) The incorrect CIT returns were filed on September 15, 1995 and August 1, 1997. (*Id.* at 884–87.)

The offenses charged under Count One are Valentino's participation in an organization that has as its purpose committing crimes, that is, to file incorrect tax returns. (*See* D.E. 60-1 at 860–61.) The charging document describes "organization"

25

as "a collaborative arrangement" between Valentino, Oxbridge entities, and other individual defendants. (*Id.* at 860.) It also describes "participation" as carrying out "preparatory" acts of purchasing companies and making contacts, which appear to be analogous to overt acts in furtherance of a conspiracy. (*Id.* at 861.)

The offenses charged under Count One fit squarely within the definition of a conspiracy prosecutable under 18 U.S.C. § 371. To prove a conspiracy, the government must show "(1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy." *United States v. Tinghui Xie*, 942 F.3d 228, 240 (5th Cir. 2019). Valentino's agreement with other individual defendants can be inferred from circumstantial evidence. *United States v. Morado*, 454 F.2d 167, 174 (5th Cir. 1972). Valentino and the other individual defendants discussed devising a scheme to eliminate the Dutch FPCs' tax liability and subsequently implemented that scheme. *See supra* part B.5.b. Valentino acted with knowledge of the unlawful objective, which was to file false CIT returns. *See id.* The acquisition of the Dutch FPCs, purchase of assets, and filing of incorrect tax returns all constitute overt acts in furtherance of the conspiracy. *See supra* part B.5.

Where the object of the conspiracy is tax evasion, a six-year statute of limitations is applicable. 26 U.S.C. § 6531(8); *see, e.g.*, *United States v. White*, 671 F.2d 1126, 1134 (8th Cir. 1982) (affirming the conviction of conspiracy and applying the six-year statute of limitations under 26 U.S.C. § 6531(8), where the defendants concealed a co-op's income and made false income tax returns on behalf of the co-op). The statute of limitations for a conspiracy charge begins to run from the date of the last overt act committed by any of the co-conspirators. *Fiswick v. United States*, 329 U.S. 211, 216 (1946); *United States v. Davis*, 533 F.2d 921, 929 (5th Cir. 1976). Here, it is certain an overt act furthering the conspiracy took place on August 1, 1997, when Valentino and others submitted tax returns for American Energy B.V. and American Energy Mining B.V. (*See* D.E. 60-1 at 886–87.) Thus, the statute of limitations would have expired, at the earliest, on August 1, 2003, after the summons was issued.

Valentino argues that the elements of Article 140, which require participation in an organization that has a criminal purpose, are most analogous to the substantive Racketeer Influenced and Corrupt Organizations Act (RICO) offense under 18 U.S.C. § 1962(c). Because a five-year statute of limitations applies to a RICO offense, *see* 18 U.S.C. § 3282; *United States v. Vogt*, 910 F.2d 1184, 1195 (4th Cir. 1990), Valentino argues that the limitations period to prosecute the offenses charged

27

under Count One would have expired on August 1, 2002, more than three months before the summons was filed. (*Id.* at 860–71.)

Valentino argues that the conspiracy offense under 18 U.S.C. § 371 is not analogous to the offenses charged under Count One because, unlike section 371, Article 140 of the Netherlands Penal Code does not require an agreement as an element. A similar argument has been rejected in *Clarey v. Gregg*, 138 F.3d 764 (9th Cir. 1998). In *Clarey*, Mexico filed a request to extradite an individual who committed murder in Mexico by beating the victim during a robbery. *Clarey*, 138 F.3d at 765. The extraditee argued that the crime of manslaughter was most analogous to the Mexican crime of "simple homicide," which was defined under Mexico law as murder occurring when one takes another's life. *Id.* at 766. The Court of Appeals for the Ninth Circuit rejected the extraditee's argument and found that felony murder, not simple homicide, was the crime most analogous to the charged offenses, "in light of the conduct actually charged." *Id.* at 766–67.

Like the argument rejected in *Clarey*, Valentino's argument—that the elements of Article 140 do not match the elements of a conspiracy charge—shifts the focus from the conduct underlying his offense to the Dutch statute being applied to that conduct. Accepting Valentino's argument would be to commit the very error that the *Clarey* court sought to avoid.

28

Further, the court notes tax evasion is not a predicate offense under the RICO statute. *See* 18 U.S.C. § 1961(1) (enumerating the crimes that may comprise a "racketeering activity"); *Arroyo v. Oprona, Inc.*, No. CV H-16-852, 2017 WL 7792617, at *3 (S.D. Tex. Apr. 11, 2017) ("[T]ax evasion, making a false statement on a tax return, or conspiracy to defraud the United States, are not predicate offenses under the RICO statute."), *report and recommendation adopted*, No. CV H-16-852, 2017 WL 3866425 (S.D. Tex. Sept. 5, 2017). It is therefore difficult to see how a RICO offense would be the offense most analogous to that charged under Count One.

The core of the offenses under Count One for which Valentino's extradition is sought is "filing incorrect CIT returns and/or Income Tax Returns." (*See* D.E. 60-1 at 860–61.)[6] Conspiracy to evade taxes is most analogous to Valentino's offenses charged under Count One, and the six-year statute of limitations applies.

The object of the lapse of time provision of the Treaty is to prevent offending the statute of limitations in the United States. *Clarey*, 138 F.3d at 767. Thus, even if Valentino could find some other statute that fits his conduct, he clearly could have been prosecuted in the United States for conspiracy to submit false tax returns at the

---

[6] The Court of Appeals of Amsterdam dismissed charges against Valentino as to intentional use of forged documents. (*See* D.E. 60-1 at 1184.)

time the summons was issued in the Netherlands. The court is satisfied that extraditing Valentino would not offend the statute of limitations in the United States.

### (2) Prosecution under Count Two did not violate the statute of limitations.

As to Count Two, the Court of Appeals of Amsterdam found that, on the following dates, Valentino "intentionally incorrectly filed a return provided by tax law . . . while each time the consequence of this could be that too little tax might be assessed": (1) on September 15, 1995, twice, for American Energy B.V.; (2) on September 15, 1995, for American Energy Resources N.V.; (3) on August 1, 1997, for American Energy B.V.; and (4) on August 1, 1997, for American Energy Mining B.V. (D.E. 60-1 at 884–87.) The Court of Appeals of Amsterdam charged these offenses under a single count. (*See* D.E. 60-1 at 884–87.)

The offenses charged under Count Two are Valentino's filing of incorrect or incomplete tax return on behalf of the Dutch FPCs, which could result in the understatement of tax liability. (D.E. 60-1 at 861–64.) This fits squarely with the crime of tax evasion or attempted tax evasion prosecutable under section 7201 of the Internal Revenue Code (I.R.C.). Section 7201 makes it unlawful for "[a]ny person" to "willfully attempt[] in any manner to evade or defeat any tax imposed by this title or the payment thereof." 26 U.S.C. § 7201.

To prove tax evasion, the government must show willfulness, existence of a tax deficiency, and an affirmative act constituting an evasion or attempted evasion

30

of tax. *Sansone v. United States*, 380 U.S. 343, 351 (1965); *United States v. Kim*, 884 F.2d 189, 192 n.1 (5th Cir. 1989). "I.R.C. § 7201 is not limited to prosecutions of those who evade taxes that they may owe themselves, but rather it encompasses prosecutions of any person who attempts to evade the tax of anyone." *United States v. Townsend*, 31 F.3d 262, 267 (5th Cir. 1994); *see, e.g.*, *United States v. Whiteside*, 404 F. Supp. 261 (D. Del. 1975) (affirming conviction under 26 U.S.C. § 7201 for the defendant-accountant, who prepared federal income tax returns for his clients and caused tax evasion).

As discussed fully above, evidence shows that Valentino acted with knowledge that the transactions would result in false tax returns. *See supra* part B.5. Valentino carried out affirmative act of tax evasion by designing the asset acquisition and depreciation scheme and providing tax information to Oxbridge's accountants, which resulted in the understatement of the Dutch FPCs' tax liability. *See supra* part B.5.

A six-year statute of limitations applies to section 7201 offenses. 26 U.S.C. § 6531(2). It is well-established that the limitations period "runs from the later date of either: when the tax return was due or the defendant's last affirmative act of tax evasion." *United States v. Irby*, 703 F.3d 280, 283–84 (5th Cir. 2012) (collecting cases). Here, the last conduct charged under Count Two attributable to Valentino occurred on August 1, 1997. The statute of limitations would have expired after

August 1, 2003, six years from the date of the last affirmative act of tax evasion. The Dutch prosecutors issued the summons on November 19, 2002, before the limitations period expired. Thus, prosecuting Valentino under 26 U.S.C. § 7201 would not have been time-barred in the United States.

Valentino argues section 7201 crimes are not analogous to the offense charged under Count Two because the elements do not match the elements of Article 68 of the Netherlands State Taxes Act or Valentino's alleged conduct. (Valentino Reply, D.E. 61 at 9–10.) For example, Valentino argues that the element of tax deficiency was not met, stating that the Court of Appeals of Amsterdam found that "certain of the returns 'did not result in the evasion of corporate income tax because, even after correction of the taxable amount, the corporate income tax due was still zero.'" (Valentino Reply, D.E. 61 at 10–11 n.4 (citing D.E. 60-1 at 976).) Valentino misconstrues the opinion by the Court of Appeals of Amsterdam. The opinion states that false "depreciation and other charges" did not always result in evasion of tax because "all profits present in the company were already absorbed by the— fictitious—charges arising from the contribution of intangible rights." (D.E. 60-1 at 976.) In other words, correcting the taxable amount not only for depreciation charges but also for contribution of intangible rights would have resulted in a tax deficiency.

Valentino was charged under Count Two for committing a series of acts as part of a scheme to evade taxes and to profit from it. Valentino's filing of each tax

returns may also be charged under section 7206(2), but that has no effect on the present analysis. "[M]ultiple acts committed in the course of evading taxation are routinely charged under the same count." *United States v. Sertich*, No. SA:14-CR-826(1)-DAE, 2015 WL 3407258, at *4 (W.D. Tex. May 26, 2015) (collecting cases).

Further, accepting Valentino's alternative theory would not change the outcome. Valentino argues that the offenses charged under Count Two are most analogous to the crime of aiding or assisting in the preparation of false or fraudulent tax returns in violation of 26 U.S.C. § 7206(2). That provision states as follows:

> **Aid or assistance.**—Willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document.

26 U.S.C. § 7206(2) (emphasis in original). A six-year statute of limitations applies to section 7206 offenses. 26 U.S.C. § 6531(3).

Valentino argues the limitation period for section 7206(2) offense begins to run "at the time the return is filed." *United States v. Habig*, 390 U.S. 222, 223 (1968). Under his theory, each of the five returns stands on its own as an offense, and the prosecution of the 1995 tax returns would be time-barred.[7] If so, Valentino argues

---

[7] Valentino also appears to misconstrue the record when he argues that the Netherlands court itself acquitted him of the 1995 tax returns. (D.E. 71 at 5.) Valentino was acquitted of violations based on tax returns numbered D/133 and D/134, but not for D/130, D/131, and D/135. (*Compare* D.E. 60-1 at 911 n.99, 967, 1182 *with* D.E. 60-1 at 884–86.)

that extradition must be denied because the Netherlands seeks to enforce the judgment that "rests generally on Count 1 and all five returns." According to Valentino, each of the five false tax returns would have been charged separately under section 7206(2) in the United States. He argues that three of the five would have been dismissed as time-barred. As a result, he argues, even though two of the counts would stand as convictions in the United States, his sentence, which is based on all five tax returns, would need to be recalculated.

Taking Valentino's argument to its logical conclusion, it is not clear that his sentence would need to be re-calculated. Sentencing law in the United States would require the court to consider the tax loss from the 1995 tax returns as relevant conduct, in addition to the tax loss from the 1997 returns.[8] It is undisputed that prosecution for the 1997 returns under 26 U.S.C. § 7206(2) would have been timely. It follows that, even if the court were to apply the six-year statute of limitations set forth in 26 U.S.C. § 6531(3) for section 7206(2) offenses, a sentencing court in the United States would have considered the 1995 tax returns charged under Count Two.

Moreover, the rule of non-inquiry counsels against criticizing the charging practices in the Netherlands. *See Yapp*, 26 F.3d at 1567–68 (holding that "a district

---

[8] Sentencing for conviction under 26 U.S.C. § 7206(2) requires grouping of multiple counts. U.S.S.G. §§ 2T1.4, 3D1.2. Courts are required to consider relevant acts that are "part of the same course of conduct or scheme or plan." U.S.S.G. § 1B1.3(a)(2). "§ 1B1.3(a)(2) does not limit acts that are 'part of the same course of conduct or scheme or plan' to the period covered by the statute of limitations." *United States v. Lokey*, 945 F.2d 825, 840 (5th Cir. 1991).

judge or magistrate judge, generally unfamiliar with foreign judicial systems and the problems and circumstances facing them, to assess the reasonableness of a foreign government's actions in an informational vacuum"). The Netherlands charged Valentino's offenses, including the tax returns filed in 1997, as one crime, under a single count. That single crime continued into the five-year window before the summons was issued. Under the rule of non-inquiry, the court declines to accept Valentino's argument that his sentence cannot be enforced.

Further, Valentino's argument necessitates interpreting Article 6 to require all offenses charged under a single count to be prosecutable within the statute of limitations in the Requested State. The well-established rule in interpreting a treaty governing extradition between two nations is that the treaty should be construed liberally, to achieve the purpose for which the treaty was written. *See Factor v. Laubenheimer*, 290 U.S. 276, 293–94 (1933). Adopting Valentino's argument would impose restrictions that are not in the text of the Treaty between the United States and the Netherlands, in contravention of *Laubenheimer*.

Therefore, the court finds that prosecuting Valentino for the offenses under Count Two would not have been time-barred in the United States at the time the Dutch authorities initiated the prosecution in 2002.

The time-lapse provision of the Treaty does not bar Valentino's extradition.

**7. Equitable considerations do not bar the certification of extradition.**

Valentino raises the equitable argument that the lapse of time between the sentencing in the Netherlands and the filing of the extradition complaint weighs against extradition. While the court recognizes Valentino's advanced age and the passage of time after he was sentenced in the Netherlands, the court's role in the extradition proceeding is a narrow one. *See United States v. Montemayor Seguy*, 329 F. Supp. 2d 871, 876 (S.D. Tex. 2004) ("The statutory process for extradition comports with the Constitution and, under it, with the executive's authority to conduct foreign affairs and with this court's distinct, limited role."). The final decision on whether or not to extradite the fugitive is reserved to the Secretary of State. 18 U.S.C. § 3186 (2001); *see Vo v. Benov*, 447 F.3d 1235, 1237 (9th Cir. 2006) ("[E]xtradition is a matter of foreign policy entirely within the discretion of the executive branch, except to the extent that the statute interposes a judicial function."). The court thus reserves any equitable considerations to the Secretary of State.

## C. CONCLUSION

Based on the findings above, the court finds that Joseph Valentino is extraditable to the Kingdom of the Netherlands for each offense for which extradition was requested. The court hereby certifies this finding to the Secretary of State as required under Title 18, United States Code, Section 3184.

It is ordered that a warrant may issue for the surrender of the defendant to the proper authorities of the Kingdom of the Netherlands in accordance with the Extradition Treaty between the United States of America and the Kingdom of the Netherlands.

It is hereby ORDERED that JOSEPH VALENTINO is committed to the custody of the United States Marshal, or his authorized representative, to be confined in an appropriate facility and to remain until he is surrendered to the Kingdom of the Netherlands pursuant to applicable provisions of the Treaty and United States law.

It is further ORDERED that the United States Attorney for this judicial district shall forward a copy of this Certification and Order together with a copy of all transcripts of the proceedings and copies of the documents received in evidence in this matter to the Secretary of State.

It is so ordered.

Signed at Houston, Texas on January _23_, 2020.

Peter Bray
United States Magistrate Judge